951 A.2d 1017

ELIZABETH MASON, PLAINTIFF–APPELLANT, v. CITY OF HOBO-
KEN, JAMES FARINA, CITY CLERK OF THE CITY OF HOBO-
KEN, INDIVIDUALLY AND IN HIS PROFESSIONAL CAPACI-
TY AS CITY CLERK OF THE CITY OF HOBOKEN, ROBERT
DRASHEFF, INDIVIDUALLY AND IN HIS PROFESSIONAL
CAPACITY AS BUSINESS ADMINISTRATOR OF THE CITY OF
HOBOKEN, ALFRED AREZZO, INDIVIDUALLY AND IN HIS
PROFESSIONAL CAPACITY AS CONSTRUCTION OFFICIAL
OF THE CITY OF HOBOKEN, DEFENDANTS–RESPONDENTS.

ELIZABETH MASON, PLAINTIFF–APPELLANT, v. CITY
OF HOBOKEN AND CITY CLERK OF THE CITY OF
HOBOKEN, DEFENDANTS–RESPONDENTS.

Argued February 20, 2008—Decided July 22, 2008.

*Jeffrey L. Kantowitz* argued the cause for appellant (*Goldberg, Mufson & Spar,* attorneys).

*Steven W. Kleinman,* Corporation Counsel, argued the cause for respondents.

*John C. Connell* argued the cause for amicus curiae New Jersey Press Association (Archer & Greiner, attorneys; *Mr. Connell, William L. Ryan and Benjamin P. Morgan,* on the brief).

*Lewis A. Scheindlin,* Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

*Regan H. Crotty* submitted a brief on behalf of amicus curiae American Civil Liberties Union of New Jersey (Dechert and Edward L. Barocas, Legal Director, American Civil Liberties Union of New Jersey, attorneys; *Mr. Crotty, Mr. Barocas, Christopher J. Michie, Mr. Barocas, and Jeanne M. LoCicero,* on the brief).

*Allyn Z. Lite* submitted a brief on behalf of amicus curiae Center for Auto Safety (Lite DePalma Greenberg & Rivas, attorneys; *Mr. Lite and Bruce P. Greenberg,* on the brief).

*Richard M. Gutman* submitted a brief on behalf of amicus curiae Libertarian Party of Central New Jersey Open Government Task Force.

*John J. Collins* submitted a letter brief on behalf of amicus curiae Municipal Clerks Association of New Jersey, Inc.

Chief Justice RABNER delivered the opinion of the Court.

The Open Public Records Act (OPRA) plainly identifies its purpose at the outset: to insure that government records, unless exempted, are readily accessible to citizens of New Jersey for the protection of the public interest. *N.J.S.A.* 47:1A–1. To accomplish that aim, OPRA sets forth a comprehensive framework for access to public records. Among other things, the Act outlines a swift timeline for disclosure of records and sets forth different procedures to challenge decisions denying access. Two aspects of the statute are raised in this appeal: (1) the appropriate statute of limitations for filing a lawsuit in Superior Court; and (2) whether plaintiffs are entitled to attorney's fees when a government agency voluntarily discloses records after a lawsuit is filed.

In light of the statute's history and purpose, as well as long-standing New Jersey precedent, we find that OPRA actions have a 45–day statute of limitations, consistent with actions in lieu of prerogative writs. We also conclude that requestors may qualify for attorney's fees under OPRA if they can show that their lawsuit was causally related to securing the relief obtained and that the relief granted had some basis in law. Consistent with our case law, requestors have that burden of proof. However, when an agency has not responded at all to a request within seven business days, the burden of proof shifts to the government agency.

Applying those standards, plaintiff is not entitled to fees. We, therefore, affirm the judgment of the Appellate Division as modified.

## I.

This appeal involves two separate lawsuits filed by plaintiff Elizabeth Mason and consolidated by the Appellate Division. Plaintiff is a Hoboken resident who is no stranger to OPRA or Hoboken's records custodians. During a period of about one year beginning in October 2003, she filed 125 separate requests for public records. Seventeen of those requests underlie the lawsuits in question.

Defendants are the City of Hoboken; James Farina, the City Clerk; Robert Drasheff, the city's business administrator; and Alfred Arezzo, the city's construction official. Farina's duties include serving as custodian of public and government records for the City of Hoboken.

## A.

Plaintiff's first lawsuit stems from her OPRA request on February 9, 2004 for copies of Hoboken's general ledgers for fiscal years 2003 and 2004. On February 20, Hoboken officials faxed Mason a memo written by defendant Drasheff explaining that the ledgers were not immediately available because they were in the process of being corrected. The memo advised that the 2003 ledger should be available a week later, by February 27, and the 2004 ledger one week after that. (Throughout this period, defendant Drasheff was attending to his critically ill mother who passed away on March 3, 2004. Because of his personal obligations at the time, Drasheff was unable to carry out all his duties as business administrator, which included assisting with OPRA requests relevant to his position.) Mason responded in writing reiterating her request for both ledgers in the form they existed on the date of the original request. On February 27, Mason visited the City Clerk's office and renewed her request to see both ledgers. They were not available.

On March 4, 2004, plaintiff filed a verified complaint seeking access to the ledgers under OPRA and the common law. The next

day, the trial court held a telephone conference with the parties. During the conference, defendants advised plaintiff that copies of the requested records were available to be picked up. Plaintiff caused someone to retrieve them two or three days later, and Hoboken officials believed the matter was resolved. The parties never entered into a formal stipulation of settlement.

Plaintiff raised the issue of attorney's fees for the first time the following year, in February 2005, during oral argument on her second complaint. She asserted that she was entitled to attorney's fees as a prevailing party under OPRA. The trial court denied her request, and the Appellate Division affirmed.

### B.

Plaintiff's second lawsuit relates to fifteen particular OPRA requests she made from October 2003 through September 2004. Plaintiff filed a thirty-count verified complaint on September 27, 2004, seeking access to all of the records requested, attorney's fees, costs, and civil penalties. (Each odd-numbered count alleges an OPRA violation; even-numbered counts set forth corresponding causes of action under the common law right of access.)

For reasons that follow, the last four counts merit closer attention. Counts 27 and 28 relate to plaintiff's September 22, 2004 OPRA request for Hoboken's "Introductory Budget (in paper format) and electronic format" for 2005. Less than one hour after plaintiff made the request, Hoboken officials supplied her with a paper copy of the document. They also advised her that the budget would be available on the Internet at an indeterminate future time.

Plaintiff's September 27, 2004 complaint alleges that the failure to supply her with an introductory budget in electronic form denied her access to records to which she was entitled. Approximately three weeks later, on October 19, defense counsel advised plaintiff's counsel that the requested information was available on the Internet and could be downloaded.

Counts 29 and 30 are based on plaintiff's July 20, 2004 request "[t]o review all OPRA Requests for 2002, 2003, [and] 2004." Hoboken responded two days later, and the parties arranged for Mason to begin reviewing the OPRA requests on August 10. On August 26, a Hoboken official notified Mason that the balance of the items was ready for review. Plaintiff completed inspecting the documents on September 22—five days before filing the second lawsuit—and on October 15—eighteen days after filing the suit.

Counts 1 through 26 relate to various other OPRA requests that plaintiff alleges were not produced in a timely fashion. Some of the items sought are summarized below. In June 2004, for example, plaintiff requested:

- All Blue Cross Blue Shield contracts then in use by Hoboken and its subsidiaries;

- A copy of the general ledger for the fiscal year 2004 in electronic form;

- The names of all Hoboken employees and their positions and pension records (yearly and totals to date); and

- A report in electronic form of names, titles, positions, payroll records, and the amount and type of pensions for all employees, contract workers, and other individuals who received pensions and/or salaries from the City or its subsidiaries.

The following month, July 2004, plaintiff asked for the following:

- Copies of contracts with Oxford Health Plans, the State of New Jersey, or any other health care organization used by Hoboken or its associated boards;

- A detailed contract listing report in electronic form for 2001, 2002, 2003, and 2004;

- To review all applications for permits for building/construction for 2001, 2002, 2003, and 2004, which Hoboken officials estimated called for the inspection of 70,000 sheets of paper; and

- To review all OPRA requests for 2002, 2003, and 2004, which request forms the basis for Counts 29 and 30.

This two-month sampling shows the breadth and scope of plaintiff's requests.

The trial court dismissed the second complaint and denied plaintiff's request for attorney's fees. The Appellate Division affirmed.

## II.

The trial court issued a comprehensive, 47–page opinion. It began by considering the proper filing period for an OPRA complaint. The court concluded that actions under OPRA and their common law counterpart are actions in lieu of prerogative writs because they "essentially seek[ ] an order to force a government official to comply with a ministerial duty." As a result, the court held they are subject to the 45–day filing period of *Rule* 4:69–6(a).

The first lawsuit was filed within this time limit. Plaintiff conceded that some of the counts in the second suit were not. The court rejected plaintiff's argument to extend the time for filing those claims under *Rule* 4:69–6(c) and, accordingly, dismissed Counts 1 through 26 of the second lawsuit. The court dismissed the remaining counts as moot because Hoboken had provided the records sought either during or before the litigation.

The trial court also denied plaintiff attorney's fees in both lawsuits. Relying on *Buckhannon Board & Care Home v. West Virginia Department of Health & Human Resources*, 532 *U.S.* 598, 121 *S.Ct.* 1835, 149 *L.Ed.*2d 855 (2001), the court rejected the "catalyst theory"—which requires a plaintiff to establish that her lawsuit brought about the desired relief and had a basis in law— and found that plaintiff was not a prevailing party under OPRA. The court concluded that the same analysis applied to the common law claims.

The Appellate Division affirmed the trial court's judgment for substantially the same reasons. The panel explained that OPRA requires matters to proceed summarily and expeditiously, but not necessarily as summary proceedings under *Rule* 4:67. With regard to the issue of attorney's fees, the panel noted that *Teeters v. Division of Youth & Family Services*, 387 *N.J.Super.* 423, 904 *A.*2d 747 (App.Div.2006), *certif. denied*, 189 *N.J.*, 426, 915 *A.*2d 1049 (2007), which adopted the catalyst theory and distinguished *Buckhannon*, had been decided after the trial court's ruling. Regardless, the panel found that plaintiff could not prevail under

the catalyst theory because, unlike in *Teeters*, there was no settlement below and because plaintiff failed to establish that Hoboken would not have acted the same way absent a lawsuit.

We granted plaintiff's petition for certification. 192 *N.J.* 73, 926 *A.*2d 857 (2007). We also granted amicus curiae status to the Attorney General, the American Civil Liberties Union of New Jersey, the New Jersey Press Association, the Libertarian Party of Central New Jersey Open Government Task Force, and the Center for Auto Safety.

## III.

Plaintiff argues that OPRA actions are not actions in lieu of prerogative writs for a number of reasons including the following: in adopting OPRA, the Legislature eliminated prerogative writ language present in the predecessor Right to Know Law (RTKL), formerly *N.J.S.A.* 47:1A–1 to –4 (repealed 2002); decisions under OPRA involve the exercise of discretion and are not merely ministerial matters that would qualify as mandamus actions; and the policies underlying OPRA—government transparency and timely access to records—suggest that OPRA requests should not be considered prerogative writ actions. As a result, plaintiff submits that the 45–day statute of limitations for prerogative writ actions should not apply to OPRA lawsuits; instead, the two-year limitations period for personal injury lawsuits should govern. *See N.J.S.A.* 2A:14–2(a). In support of her position, plaintiff also points to the absence of a time limit for OPRA actions before the Government Records Council (GRC), an alternative to litigating in Superior Court.

Plaintiff also argues that she is entitled to attorney's fees as the prevailing requestor in both of her lawsuits. Relying on *Teeters,* she contends that the catalyst theory should apply to OPRA actions, with the focus on the outcome achieved rather than the formality of a court order or settlement. Plaintiff asserts that the catalyst theory is needed to provide public entities an incentive to comply with OPRA requests on a timely basis. In plaintiff's view,

the Court should adopt a rebuttable presumption that a requesting party has "prevailed" if an agency provides records after a lawsuit is filed.

Defendants argue that OPRA lawsuits are indeed actions in lieu of prerogative writs in the nature of mandamus. As a result, defendants claim such suits are subject to the 45–day limitation period in *Rule* 4:69–6. That time limit is necessary to provide repose for public entities, according to defendants. Beyond the 45–day period, defendants note that citizens may be granted an extension of time when appropriate. In addition, they may proceed before the GRC, which defendants explain has its own procedures and purposes—and no statute of limitations.

Defendants contend that, because plaintiff has not "prevailed," she is not entitled to attorney's fees. Defendants rely on *Buckhannon's* narrow definition of "prevailing party" and its rejection of the catalyst theory for attorney's fees. Moreover, defendants submit both that *Teeters* was wrongly decided and that it does not entitle plaintiff to attorney's fees in any event because Hoboken's production of documents was not a consequence of plaintiff's lawsuit.

Five amici have submitted thoughtful briefs to the Court. The Attorney General asserts that a 45–day time limitation should apply to filing OPRA and common law right to know actions, consistent with the time frame applicable to complaints in lieu of prerogative writs and appeals of actions of state agencies. In addition, the Attorney General argues that attorney's fees should only be awarded if a plaintiff gains access to records as a result of a judgment on the merits or an enforceable consent order. The Attorney General urges this Court to follow the federal precedent established in *Buckhannon* and submits that the legislative policy underlying OPRA—promoting cooperative efforts between requestors and public agencies—is inconsistent with the catalyst theory.

The American Civil Liberties Union of New Jersey (ACLU) submits that OPRA should not be considered an action in lieu of

prerogative writs and that a 45–day deadline for filing OPRA claims undermines the statute's purposes. The ACLU also argues that attorney's fees are appropriate when a public agency violates the statute regardless of what caused the agency to disclose the records requested; according to the ACLU, the burden should be on the agency to establish that a plaintiff is not entitled to attorney's fees.

The New Jersey Press Association likewise argues that OPRA lawsuits should not be governed by the 45–day time limitation under *Rule* 4:69, which would conflict with the objectives of OPRA. The Press Association argues that no limitations period should apply. In addition, the Press Association maintains that *Teeters* correctly applied the catalyst theory to attorney's fees under OPRA.

The Libertarian Party of Central New Jersey Open Government Task Force submits that OPRA is not an action in lieu of prerogative writs and that the proper statute of limitations for OPRA is the two-year limitation for personal injury. In addition, the Libertarian Party urges that this Court follow the catalyst theory and not require a court decision or settlement as a prerequisite to awarding attorney's fees.

The Center for Auto Safety also embraces the catalyst theory and asserts that it is essential to insure that attorneys are willing to take on public interest cases.

### IV.

Plaintiff seeks relief under OPRA and the common law right of access to government records. We discuss each in turn.

### A.

█ OPRA's purpose is "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." *Asbury Park Press v. Ocean County Prosecutor's Office*, 374 *N.J.Super.* 312,

329, 864 *A.*2d 446 (Law Div.2004). To bring about that purpose, OPRA declares that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access ... shall be construed in favor of the public's right of access." *N.J.S.A.* 47:1A–1.

The statute defines "government record" broadly but also excludes twenty-one categories of information from the definition. *See N.J.S.A.* 47:1A–1.1. A "government record" includes "any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof." *Ibid.* To be considered a "government record," an item must be maintained or received in the course of official business by an "officer, commission, agency, or authority of the State or of any political subdivision." *Ibid.* "[A]dvisory, consultative, or deliberative material[s]" are not included. *Ibid.*

Certain information deemed "confidential" is excluded from the definition of "government records" that are available to the public. *Ibid.* Protected categories include criminal investigatory records, victims' records, trade secrets, various materials received or prepared by the Legislature, certain records relating to higher education, and other items. *Ibid.* Also excluded are records within the attorney-client privilege or any executive or legislative privilege, as well as items exempted from disclosure by any statute, legislative resolution, executive order, or court rule. *N.J.S.A.* 47:1A–1.1, –9.

OPRA calls for the prompt disclosure of government records. Budgets, bills, vouchers, contracts, and public employee salary information are ordinarily to be provided immediately on request. *N.J.S.A.* 47:1A–5(e). Records custodians must grant or deny access to other types of government records "as soon as possible, but not later than seven business days after receiving the re-

quest." *N.J.S.A.* 47:1A–5(i). Failure to respond within seven business days "shall be deemed a denial of the request." *Ibid.* If the record is in storage or archived, custodians must report that fact within seven business days and advise when the record will be available. *Ibid.*

Various provisions in the statute are designed to foster cooperation among requestors and agencies and reasonably accommodate their interests. For example, if a request "would substantially disrupt agency operations," a custodian may deny it "after attempting to reach a reasonable solution with the requestor." *N.J.S.A.* 47:1A–5 (g). Similarly, while access to records is to be permitted during regular business hours, smaller municipalities may limit the number of days and hours of access during the week. *N.J.S.A.* 47:1A–5(a). Also, if a request "involves an extraordinary expenditure of time and effort to accommodate," the agency may assess a special, reasonable service charge. *N.J.S.A.* 47:1A–5(c). In those cases, the requestor is entitled to review and object to the charge in advance. *Ibid.* OPRA also establishes an "informal mediation program" to resolve disputes before the GRC. *N.J.S.A.* 47:1A–7(b).

If access is denied, the requestor has the option of filing an action in Superior Court or a complaint with the GRC. *N.J.S.A.* 47:1A–6. Both "proceeding[s] shall proceed in a summary or expedited manner." *Ibid.* OPRA's predecessor, the RTKL, expressly stated that requestors could "apply to the Superior Court of New Jersey by a proceeding in lieu of prerogative writ" for relief. *N.J.S.A.* 47:1A–4 (repealed 2002). OPRA itself makes no reference to prerogative writ actions and instead defers to the Supreme Court to adopt whatever court rules "it deems necessary to effectuate the purposes of this act." *N.J.S.A.* 47:1A–12.

Finally, OPRA provides for attorney's fees and civil penalties in certain circumstances. Section 6 outlines that

> [t]he public agency shall have the burden of proving that the denial of access is authorized by law. If it is determined that access has been improperly denied, the court or agency head shall order that access be allowed. A requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee.

[*N.J.S.A.* 47:1A–6.]

Civil penalties may be imposed when "[a] public official, officer, employee or custodian ... knowingly and willfully violates [OPRA]." *N.J.S.A.* 47:1A–11. If the request was "unreasonably denied ... under the totality of the circumstances," a civil penalty of $1,000 for an initial violation will be imposed, with increasing penalties for subsequent violations. *Ibid.* In addition, a public official, officer, employee or custodian against whom a penalty is imposed may be subject to disciplinary proceedings. *Ibid.*

The above framework is commonly used today by citizens who may seek a single public record on one occasion or file dozens of requests a month; by attorneys looking for documents for a lawsuit; and by the media attempting to gather public information. Because of the volume of requests, it is not unusual for some agencies to assign full-time staff to review and respond to OPRA requests.

## B.

OPRA does not limit the common law right of access to government records, which plaintiff also advances. *N.J.S.A.* 47:1A–8. To constitute a public record under the common law, the item must be "a written memorial[ ] ... made by a public officer, and ... the officer [must] be authorized by law to make it." *Nero v. Hyland*, 76 *N.J.* 213, 222, 386 *A.*2d 846 (1978) (citations omitted). The common law definition of a public record is broader than the definition contained in OPRA. *Bergen County Improvement Auth. v. N. Jersey Media Group, Inc.*, 370 *N.J.Super.* 504, 509–10, 851 *A.*2d 731 (App.Div.), *certif. denied*, 182 *N.J.* 143, 861 *A.*2d 847 (2004); *see also Keddie v. Rutgers*, 148 *N.J.* 36, 49, 689 *A.*2d 702 (1997) (comparing common law right of access to RTKL); *Nero, supra,* 76 *N.J.* at 221, 386 *A.*2d 846 (same).

To access this broader class of documents, requestors must make a greater showing than required under OPRA: (1) "the person seeking access must 'establish an interest in the subject matter of the material'"; and (2) "the citizen's right to access

'must be balanced against the State's interest in preventing disclosure.' " *Keddie, supra,* 148 *N.J.* at 50, 689 *A.*2d 702 (internal citations omitted).

## V.

The trial court and Appellate Division both concluded that a 45–day statute of limitations should apply to OPRA actions, consistent with the limitations period in actions in lieu of prerogative writs. We agree.

The former RTKL specifically directed that litigants headed to Superior Court should proceed via an action in lieu of prerogative writs. *N.J.S.A.* 47:1A-4 (repealed 2002). That language does not appear in OPRA. *See N.J.S.A.* 47:1A-6. The parties argue at length over the meaning of this change and cite to different parts of the legislative history. In determining the Legislature's intent, though, we begin with the actual words of the statute and give them their ordinary meaning. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). Since the meaning of those words is clear in this case, we need look no further. *See ibid.*

The Legislature plainly stated that requestors denied access to public records may file an action in Superior Court or a complaint before the GRC. *N.J.S.A.* 47:1A-6. Those matters "shall proceed in a summary or expedited manner." *Ibid.* Beyond that, the Legislature specifically deferred to the Supreme Court to adopt court rules "necessary to effectuate the purposes of this act." *N.J.S.A.* 47:1A-12. The Legislature's action was consistent with our Constitution, which vests this Court with the authority to create procedural rules for court practices. *See N.J. Const.* art. VI, § 2, ¶ 3; *Winberry v. Salisbury,* 5 *N.J.* 240, 255, 74 *A.*2d 406 (1950). In other words, the statute on its face unambiguously left this Court the task of fixing the proper statute of limitations for OPRA actions.

As a starting point, we note that the fundamental nature of an action challenging a denial of access to public records has not materially changed since OPRA replaced the RTKL. Under either statute, the parties to a lawsuit in Superior Court would contest the decision of a state or local governmental body denying access to ‑claimed government records. Historically, of course, RTKL actions were subject to a 45–day statute of limitations, which applies to actions in lieu of prerogative writs under *Rule* 4:69–6. Other challenges to governmental decisions are subject to the same time limit. *Rule* 4:69, in general, governs challenges to municipal and municipal-agency actions, all of which are subject to the Rule's 45–day limit. Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:69 (2008). Likewise, challenges to State agency actions are subject to exclusive review by the Appellate Division and, as a result, must be filed within 45 days. *See R.* 2:2–3; *R.* 2:4–1(b). In addition, actions taken at a meeting in violation of the Open Public Meetings Act are to be challenged within 45 days in a proceeding in lieu of prerogative writs. *N.J.S.A.* 10:4–15(a). Like OPRA, the Open Public Meetings Act seeks to enforce a public policy in favor of open government.

In addition, OPRA's framework calls for quick action in a number of areas. Government bodies must respond promptly to requests for records: immediately in the case of budgets, bills, vouchers, contracts, and public employee salary information, *N.J.S.A.* 47:1A–5(e); and "as soon as possible, but not later than seven business days" for other government records, *N.J.S.A.* 47:1A–5(i). Disputes must be addressed swiftly as well: complaints are to proceed "in a summary or expedited manner." *N.J.S.A.* 47:1A–6. This goal is consistent with a 45–day statute of limitations, rather than an open-ended or multi-year period. Viewed as a whole, citizens are entitled to swift access to public records, and both the public and governmental bodies are logically entitled to have any disputes brought and addressed in the same, rapid manner. Just as OPRA calls for the rapid response of an agency to any record request, a requestor should also be required to make a prompt decision whether to file suit.

A 45–day time frame also provides certainty and repose to public bodies faced with numerous OPRA requests. At the same time, it offers the public ample opportunity to challenge a denial of access. For nearly forty years under the RTKL, litigants had to file actions within 45 days. In appropriate cases, courts can enlarge that time period in the interest of justice. *R.* 4:69–6(c). And today, under OPRA, requestors have the additional option of seeking mediation before the GRC in an informal setting with no statute of limitations.

■ Accordingly, we hold that requestors who choose to file an action in Superior Court to challenge the decision of an OPRA custodian must do so within 45 days. For like reasons, we adopt the same approach for common law actions. Our holding is limited to the proper statute of limitations, and we do not address whether proceedings under OPRA are to be treated as actions in lieu of prerogative writs under *Rule* 4:69 in all respects. *See MAG Entm't, LLC v. Div. of Alcoholic Beverage Control,* 375 *N.J.Super.* 534, 868 *A.*2d 1067 (App.Div.2005).

Accordingly, the trial court properly dismissed as untimely Counts 1 through 26 of plaintiff's second lawsuit.

## VI.

■ Plaintiff also challenges the lower courts' denial of her request for attorney's fees. New Jersey generally follows the "American Rule," under which a prevailing party cannot recover attorney's fees from the loser. *Rendine v. Pantzer,* 141 *N.J.* 292, 322, 661 *A.*2d 1202 (1995). Fees may be awarded, however, when a statute, court rule, or contractual agreement provides for them. In addition to OPRA, the Legislature has passed a number of fee-shifting statutes that allow for an award of reasonable attorney's fees to a prevailing party. *See, e.g., N.J.S.A.* 2A:23B–25(c) (arbitration proceedings); *N.J.S.A.* 10:5–27.1 (Law Against Discrimination); *N.J.S.A.* 34:11B–12 (Family Leave Act); *N.J.S.A.* 34:19–5(e) (employer-retaliatory claims); *N.J.S.A.* 56:8–19 (consumer-fraud actions); *N.J.S.A.* 56:9–12a (New Jersey Antitrust Act); *N.J.S.A.*

56:10–10 (Franchise Practice Act). Court rules and case law also provide for counsel fees in certain areas. *See, e.g., R.* 4:46–6 (limited attorney's fees in select summary judgment matters); *R.* 4:58–2 (select offers of judgment); *Packard–Bamberger & Co. v. Collier,* 167 *N.J.* 427, 771 *A.*2d 1194 (2001) (attorney misconduct); *Saffer v. Willoughby,* 143 *N.J.* 256, 670 *A.*2d 527 (1996) (attorney malpractice).

OPRA specifically provides that "[a] requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." *N.J.S.A.* 47:1A–6. What, then, does it mean to "prevail"? Plaintiff and various amici contend that a requestor should be presumed to have prevailed if an agency first produces records, for whatever reason, after the filing of an OPRA action; in such cases, plaintiff's lawsuit would be the presumed catalyst for the disclosure. Defendants and the Attorney General argue that plaintiffs must obtain a judgment or enforceable consent decree in order to "prevail." The law in New Jersey, developed over the course of decades, follows neither of these polar positions.

Defendants and the Attorney General rely on the United States Supreme Court's divided decision in *Buckhannon,* which rejected the catalyst theory and adopted a narrow view of the term "prevailing party." 532 *U.S.* at 604, 610, 121 *S.Ct.* at 1840, 1843, 149 *L.Ed.*2d at 862, 866–67. In *Buckhannon,* plaintiff moved for declaratory and injunctive relief, claiming that a particular West Virginia statute violated the Fair Housing Amendments Act of 1988 (FHAA), 42 *U.S.C.A.* §§ 3601–3631, and the Americans with Disabilities Act of 1990(ADA), 42 *U.S.C.A.* §§ 12101–12213. After plaintiff filed its lawsuit, the state legislature eliminated the statutory provisions in question. The district court then dismissed the case as moot.

Plaintiff moved for attorney's fees under both federal statutes as the "prevailing party." *See* 42 *U.S.C.A.* § 3613(c)(2) ("[T]he court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee...."); 42 *U.S.C.A.* § 12205 (same). Plaintiff claimed it was entitled to counsel fees under the catalyst

theory, "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon, supra,* 532 *U.S.* at 601, 121 *S.Ct.* at 1838, 149 *L.Ed.*2d at 861. While nine Courts of Appeals recognized the catalyst theory, the Fourth Circuit—of which West Virginia is a part—did not, and the Supreme Court granted certiorari to resolve the disagreement. *Id.* at 602, 121 *S.Ct.* at 1838–39, 149 *L.Ed.*2d at 861.

The Supreme Court explained that the phrase "prevailing party" is a legal term of art that refers to a "party in whose favor a judgment is rendered." *Id.* at 603, 121 *S.Ct.* at 1839, 149 *L.Ed.*2d at 862 (quoting *Black's Law Dictionary* 1145 (7th ed. 1999)). In addition to judgments on the merits, the Court held that settlement agreements enforced through a consent decree "create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* at 604, 121 *S.Ct.* at 1840, 149 *L.Ed.*2d at 862–63 (internal citations omitted). The catalyst theory, however, falls short of that standard because "[i]t allows an award where there is no judicially sanctioned change in the legal relationship of the parties." *Id.* at 605, 121 *S.Ct.* at 1840, 149 *L.Ed.*2d at 863.

The Court rejected plaintiff's argument that the catalyst theory "is necessary to prevent defendants from unilaterally mooting an action before judgment" to avoid paying attorney's fees. *Id.* at 608, 121 *S.Ct.* at 1842, 149 *L.Ed.*2d at 865. The Court also expressed concern that the catalyst theory would spawn extra litigation over attorney's fees. *Id.* at 609, 121 *S.Ct.* at 1843, 149 *L.Ed.*2d at 866.

*Buckhannon,* of course, is binding when counsel fee provisions under federal statutes are at issue. *Teeters, supra,* 387 *N.J.Super.* at 429, 904 *A.*2d 747; *see, e.g., Baer v. Klagholz,* 346 *N.J.Super.* 79, 786 *A.*2d 907 (App.Div.2001) (applying *Buckhannon* to the federal Individuals with Disabilities Education Act), *certif. denied,* 174 *N.J.* 193, 803 *A.*2d 1165 (2002). But in interpreting New Jersey law, we look to state law precedent and the specific

state statute before us. When appropriate, we depart from the reasoning of federal cases that interpret comparable federal statutes. *Rendine, supra,* 141 *N.J.* at 333, 661 *A.2d* 1202.

New Jersey law has long recognized the catalyst theory. In 1984, this Court considered the term "prevailing party" within the meaning of the federal Civil Rights Attorney's Fees Awards Act of 1976, 42 *U.S.C.A.* § 1988. *Singer v. State,* 95 *N.J.* 487, 495, 472 *A.2d* 138, *cert. denied, New Jersey v. Singer,* 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L.Ed.2d* 64 (1984). The Court adopted a two-part test espousing the catalyst theory, consistent with federal law at the time: (1) there must be "a factual causal nexus between plaintiff's litigation and the relief ultimately achieved;" in other words, plaintiff's efforts must be a "necessary and important factor in obtaining the relief," *id.* at 494–95, 472 *A.2d* 138 (internal quotations and citations omitted); and (2) "it must be shown that the relief ultimately secured by plaintiffs had a basis in law," *id.* at 495, 472 *A.2d* 138. *See also North Bergen Rex Transport v. TLC,* 158 *N.J.* 561, 570–71, 730 *A.2d* 843 (1999) (applying *Singer* fee-shifting test to commercial contract).

Also prior to *Buckhannon,* the Appellate Division applied the catalyst doctrine in the context of the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –49, and the Americans with Disabilities Act, 42 *U.S.C.A.* §§ 12101–12213. *Warrington v. Vill. Supermarket, Inc.,* 328 *N.J.Super.* 410, 746 *A.2d* 61 (App.Div.2000). The Appellate Division explained that "[a] plaintiff is considered a prevailing party 'when actual relief on the merits of [the] claim materially alters the relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Id.* at 420, 746 *A.2d* 61 (quoting *Farrar v. Hobby,* 506 *U.S.* 103, 111–12, 113 *S.Ct.* 566, 573, 121 *L.Ed.2d* 494, 503 (1992)); *see also Szczepanski v. Newcomb Med. Ctr.,* 141 *N.J.* 346, 355, 661 *A.2d* 1232 (1995) (noting that *Hensley v. Eckerhart* "generously" defines "a prevailing party [a]s one who succeeds 'on any significant issue in litigation [that] achieves some of the benefit the parties sought in bringing suit'" (quoting *Hensley v. Eckerhart,* 461 *U.S.*

424, 433, 103 *S.Ct.* 1933, 1938, 76 *L.Ed.*2d 40, 50 (1983))). The panel noted that the "form of the judgment is not entitled to conclusive weight"; rather, courts must look to whether a plaintiff's lawsuit acted as a catalyst that prompted defendant to take action and correct an unlawful practice. *Warrington, supra,* 328 *N.J.Super.* at 421, 746 *A.*2d 61. A settlement that confers the relief sought may still entitle plaintiff to attorney's fees in fee-shifting matters. *Id.* at 422, 746 *A.*2d 61.

This Court affirmed the catalyst theory again in 2001 when it applied the test to an attorney misconduct matter. *Packard–Bamberger, supra,* 167 *N.J.* at 444, 771 *A.*2d 1194. In an OPRA matter several years later, *New Jerseyans for a Death Penalty Moratorium v. New Jersey Department of Corrections,* 185 *N.J.* 137, 143–44, 883 *A.*2d 329 (2005) (NJDPM), this Court directed the Department of Corrections to disclose records beyond those it had produced voluntarily. In ordering attorney's fees, the Court acknowledged the rationale underlying various fee-shifting statutes: to insure that plaintiffs are able to find lawyers to represent them; to attract competent counsel to seek redress of statutory rights; and to "even the fight" when citizens challenge a public entity. *Id.* at 153, 883 *A.*2d 329.

After *Buckhannon,* and after the trial court's decision in this case, the Appellate Division decided *Teeters.* The plaintiff in *Teeters* requested records from the Division of Youth and Family Services (DYFS), which DYFS declined to release. 387 *N.J.Super.* at 424, 904 *A.*2d 747. After the GRC preliminarily found in plaintiff's favor, the parties reached a settlement agreement leaving open whether plaintiff was a "prevailing party" under OPRA. *Id.* at 426–27, 904 *A.*2d 747.

The Appellate Division declined to follow *Buckhannon* and held that plaintiff was a "prevailing party" entitled to reasonable attorney's fees; in line with the catalyst theory, plaintiff's complaint brought about an alteration in DYFS's position, and she received a favorable result through the settlement reached. *Id.* at 431–34, 904 *A.*2d 747. In rejecting *Buckhannon,* the panel noted

that "New Jersey statutes have a different tone and flavor" than federal fee-shifting laws. *Id.* at 430, 904 *A.*2d 747. "Both the language of our statutes and the terms of court decisions in this State dealing with the issue of counsel fee entitlements support a more indulgent view of petitioner's claim for an attorney's fee award than was allowed by the majority in *Buckhannon* . . . ." *Id.* at 431, 904 *A.*2d 747. As support for this proposition, the panel surveyed OPRA, *Packard–Bamberger, Warrington,* and other cases.

OPRA itself contains broader language on attorney's fees than the former RTKL did. OPRA provides that "[a] requestor who prevails in any proceeding shall be entitled to a reasonable attorney's fee." *N.J.S.A.* 47:1A–6. Under the prior RTKL, "[a] plaintiff in whose favor such an order [requiring access to public records] issues . . . may be awarded a reasonable attorney's fee not to exceed $500.00." *N.J.S.A.* 47:1A–4 (repealed 2002). The Legislature's revisions therefore: (1) mandate, rather than permit, an award of attorney's fees to a prevailing party; and (2) eliminate the $500 cap on fees and permit a reasonable, and quite likely higher, fee award.[1] Those changes expand counsel fee awards under OPRA.

Plaintiff and amici rightly advance another reason why the catalyst theory should apply to OPRA: the potential for abuse should an agency deny access, vigorously defend against a lawsuit, and then unilaterally disclose the documents sought at the eleventh hour to avoid entry of a court order and the resulting award of attorney's fees. *Buckhannon* dismissed this fear noting that "so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case." 532 *U.S.* at

---

[1] The significance of awarding fees to "requestors" and not "plaintiffs" is less clear because OPRA's fee-shifting provision refers both to individuals filing suit in Superior Court and those choosing the GRC's more informal mediation route; the phrase "requestors" may simply have been used to encompass both groups. Likewise, one cannot obtain an "order" from the GRC, so the absence of that language in OPRA is not necessarily revealing.

608–09, 121 *S.Ct.* at 1842, 149 *L.Ed.*2d at 865–66. But unlike other fee-shifting statutes, OPRA does not provide for damages. Under OPRA, a victorious party gains access to public records and possibly an award of attorney's fees, but not civil damages. Similarly, custodians who knowingly violate OPRA are subject to civil penalties or disciplinary proceedings, but such behavior does not give rise to an award of damages to a requestor. *N.J.S.A.* 47:1A–11. Under the catalyst theory, plaintiffs can recover counsel fees if they are able to prove their lawsuit caused an eleventh-hour disclosure.

All of these reasons favor applying the catalyst theory to OPRA actions. Our case law and the language and purpose of OPRA justify this departure from the reasoning of federal cases that interpret similar federal laws. We therefore hold that requestors are entitled to attorney's fees under OPRA, absent a judgment or an enforceable consent decree, when they can demonstrate: (1) "a factual causal nexus between plaintiff's litigation and the relief ultimately achieved"; and (2) "that the relief ultimately secured by plaintiffs had a basis in law." *Singer, supra,* 95 *N.J.* at 494, 472 *A.*2d 138. Consistent with our case law, litigants seeking fees are required to make that showing. *See ibid.; Packard–Bamberger, supra,* 167 *N.J.* at 444, 771 *A.*2d 1194; *North Bergen Rex Transport, supra,* 158 *N.J.* at 570–71, 730 *A.*2d 843; *Teeters, supra,* 387 *N.J.Super.* at 431–32, 904 *A.*2d 747.

[18] We shift the traditional burden of proof to the responding agency in one category of cases: when an agency has failed to respond at *all to* a request within seven business days. OPRA requires that an agency provide access or a denial no later than seven business days after a request. The statute also encourages compromise and efforts to work through certain problematic requests. But under the terms of the statute, the agency must start that process with some form of response within seven business days of a request. If an agency fails to respond at all within that time frame, but voluntarily discloses records after a requestor files suit, the agency should be required to prove that the lawsuit was

not the catalyst for the agency's belated disclosure. Such an approach is faithful to OPRA's clear command that an agency not sit silently once a request is made.

Plaintiff, though, seeks to go beyond the catalyst theory. She asks this Court to find that OPRA includes a rebuttable presumption that a requestor has "prevailed" and is entitled to attorney's fees whenever a defendant discloses a requested record after the filing of an OPRA complaint. Plaintiff and amici contend that a rebuttable presumption will help level the playing field between citizens and public entities and attract competent counsel to represent individuals. The proffered approach, however, does not find support in our case law. In fact, our cases involve an award of counsel fees *after* the entry of some form of court order or enforceable settlement, while leaving open the possibility of attorney's fees if a litigant can prove the necessary factual, causal nexus.

The debate over counsel fees in *Singer*, for example, followed a lower court ruling in plaintiff's favor granting the declaratory and injunctive relief plaintiff sought. 95 *N.J.* at 491, 472 *A.2d* 138. *North Bergen Rex Transport* permitted an award of reasonable attorney's fees after trial and final judgment. 158 *N.J.* at 567, 730 *A.2d* 843. In *Warrington,* the parties entered into a settlement that formed the basis of a consent judgment. 328 *N.J.Super.* at 415–16, 746 *A.2d* 61. In *Packard–Bamberger,* the trial court awarded fees for claims on which plaintiffs obtained relief at trial and upon the court's adoption of recommendations by a special master. 167 *N.J.* at 438–40, 771 *A.2d* 1194. In *NJDPM,* an OPRA action in which defendant voluntarily disclosed some records after the lawsuit was filed, the trial court entered an order directing disclosure of all or part of the more numerous documents plaintiff sought. 185 *N.J.* at 144, 883 *A.2d* 329. Even in *Teeters,* the GRC made preliminary findings and recommendations in plaintiff's favor on her OPRA requests, and the parties then reached a settlement agreement. 387 *N.J.Super.* at 426–27, 904 *A.2d* 747. None of those cases were resolved by a defendant's

voluntary disclosure of records without a court order or settlement agreement. In other words, attorney's fees were not awarded, let alone presumed appropriate, in response to a defendant's voluntary disclosure alone.

OPRA itself offers sound reasons for not extending beyond the catalyst theory. The statute is designed both to promote prompt access to government records and to encourage requestors and agencies to work together toward that end by accommodating one another. A number of provisions discussed previously illustrate the point. For example, if a request "would substantially disrupt agency operations," a custodian must "attempt[ ] to reach a reasonable solution with the requestor that accommodates the interests of the requestor and the agency." *N.J.S.A.* 47:1A–5(g). The GRC has taken the logical approach that custodians may obtain consent from requestors to extend the seven-business-day deadline in *N.J.S.A.* 47:1A–5(i). *See, e.g., Paff v. Bergen County Prosecutor,* GRC No.2005–115 (N.J. March 15, 2006). *See also N.J. Builders Ass'n v. N.J. Council on Affordable Hous.,* 390 *N.J.Super.* 166, 183, 915 *A.*2d 23 (App.Div.), *certif. denied,* 190 *N.J.* 394, 921 *A.*2d 448 (2007) (discussing reasonable solutions under OPRA). Also, if a request "involves an extraordinary expenditure of time and effort to accommodate," the agency may charge a special, reasonable service charge. *N.J.S.A.* 47:1A–5(c). Requestors in those cases are entitled to review and object to the charge in advance. *Ibid.* OPRA also established the GRC to resolve disputes through an "informal mediation program." *N.J.S.A.* 47:1A–7(b).

A rebuttable presumption might well upend the cooperative balance OPRA strives to attain. Under such a rule, plaintiffs would have an incentive to file suit immediately after a request for disclosure is denied or not responded to in a timely fashion, based in part on the expectation of an award of attorney's fees. Agencies, in turn, would have reason not to disclose documents voluntarily after the filing of a lawsuit. If they did, they would be presumed liable for fees. As a result, courts could expect to see

more aggressive litigation tactics and fewer efforts at accommodation. And in the former instances, OPRA cases designed to obtain swift access to government records would end up as battles over attorney's fees.

The catalyst theory provides a more sound approach. It empowers courts to award fees when the requestor can establish a "causal nexus" between the litigation and the production of requested records. Trial courts would conduct, that fact-sensitive inquiry on a case-by-case basis, evaluating the reasonableness of, and motivations for, an agency's decisions, and viewing each matter on its merits.

 The parties have not addressed at length whether the question of attorney's fees merits different treatment in an action brought under the common law. Absent an apparent, theoretical basis for such a distinction, we conclude that the catalyst theory applies to common law suits as well.

## VII.

 In accordance with these standards, plaintiff is not entitled to attorney's fees in either lawsuit. In the first matter, plaintiff sought copies of Hoboken's general ledgers for fiscal years 2003 and 2004. She submitted an OPRA request on February 9, 2004. Hoboken responded on February 20, eight business days later, or one day beyond the statutory limit. (February 16 was a holiday.) As a result, the burden shifts to Hoboken to prove that plaintiff's lawsuit, filed on March 4, was not the catalyst behind the City's voluntary disclosure.

In that regard, defendant presented the following information: (1) Hoboken responded to plaintiff that the ledgers were not immediately available because they were in the process of being corrected. The City's February 20 response included a copy of a memo written by defendant Drasheff dated February 19—the seventh business day—which advised that the 2003 ledger should be available on February 27, and the 2004 ledger one week later.

Hoboken did not meet those deadlines; (2) defendant Drasheff's mother was critically ill and suffered a massive and ultimately fatal heart attack during the relevant time frame, which complicated Hoboken's efforts to respond; (3) during a conference call with the trial court on March 5, the day after plaintiff filed her lawsuit, Hoboken advised her that the requested records were available to be picked up; and (4) defendant Drasheff later certified that the records would have been provided on the same day they were disclosed absent any lawsuit.

Based on the record, defendants have carried their burden of proving that plaintiff's lawsuit was not the catalyst for their release of records. As a result, plaintiff is not a prevailing party entitled to attorney's fees.

In her second lawsuit, plaintiff sought (1) Hoboken's introductory budget for 2005, in paper and electronic format (which she requested on September 22, 2004) (Counts 27 and 28), and (2) an opportunity to review all OPRA requests for 2002, 2003, and 2004 (which she requested on July 20, 2004) (Counts 29 and 30).

Less than an hour after making the September 22 request, Hoboken supplied plaintiff with a paper copy of the 2005 budget. It also advised her that the budget would be placed on the Internet at a future time, which occurred by October 19. According to the record, Hoboken had adopted an ordinance in August 2004, one month before plaintiff's request, providing for electronic access to public information on the City's website. The ordinance was to go into effect sixty days later, in order to allow Hoboken sufficient time to work through any technical issues. The 2005 budget was posted on the website in October 2005, consistent with that plan. Nothing in the record reveals that plaintiff's September 27 complaint had a causal relationship to the posting on the Internet.

Hoboken responded within two days of plaintiff's request to review all OPRA requests for 2002 through 2004, and the parties

arranged for her to start reviewing them on August 10. Two weeks later, a Hoboken official notified plaintiff that the remaining items were ready for inspection. She reviewed them on September 22—before filing the second lawsuit—and again on October 15—eighteen days after filing suit. Because Hoboken had agreed to plaintiff's request before she even filed suit, she cannot establish that her lawsuit entitles her to fees under the catalyst theory. Nothing in the record suggests that the final day of review would not have occurred absent plaintiff's lawsuit.

## VIII.

For the reasons set forth above, the judgment of the Appellate Division is affirmed as modified.

*For affirmance as modification*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS.

*Opposed*—None.